```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,                )
                                 )
    v.                            )    No. 4:09 CR 535 DJS
                                 )                      DDN
ANTONIO HARRIS,                   )
                                 )
        Defendant.                )
```

**ORDER AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The pretrial motions of the parties were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). The pretrial hearing was held on November 17, 2009.

At the pretrial hearing defendant Antonio Harris withdrew all of his pretrial motions to suppress evidence (Docs. 13 oral, 30, 35), except his motion to suppress identification testimony (Doc. 36). Also before the court is his motion to sever counts (Doc. 37).

The government has withdrawn as moot its motion for a determination by the court of the admissibility or not of any arguably suppressible evidence (Doc. 14 oral).

**MOTION TO SEVER**

Defendant Harris is charged in the indictment with one count of being a felon in possession of a firearm on August 29, 2008 (Count 1), and with possessing marijuana with the intent to distribute it on August 18, 2009 (Count 2).

Defendant has moved to sever these counts for separate trials, because the indictment does not indicate that the alleged crimes are sufficiently related, as required by Federal Rule of Criminal Procedure 8(a). The government agrees and does not oppose the motion. The court agrees and will sustain the motion.

**MOTION TO SUPPRESS IDENTIFICATION TESTIMONY**

From the evidence and information adduced at the hearing held on November 17, 2009, the court makes the following findings of fact and conclusions of law:

**FACTS**

1. At approximately 3:30 p.m. on August 29, 2008, St. Louis Metropolitan Police Detective Daniel Schulte was dispatched to investigate a shooting that occurred a short time earlier. The dispatcher reported that two African American males, one wearing a ski mask and the other wearing long braided hair, had alighted from a maroon vehicle, shot and wounded at least one person in a neighborhood playground, and fled the scene in the maroon vehicle, near the intersection of Franklin and Compton Avenues in the Chambers Park area of St. Louis.

2. Det. Schulte arrived on the scene quickly, attended to the shooting victims, and began gathering information about the shooters. Within five minutes of his arrival, Schulte was given the identities of shooting victim Anthony Lee, and three witnesses, Steven Roberts, Michael Faulkner, and Jemal Holt. All three witnesses were on the playground when the shooting happened. One of the perpetrators was described as wearing a hoodie or a ski mask. One of the perpetrators was identified as a stocky black male with dredlocks. The detective interviewed each of the non-victim witnesses separately on the playground. Holt described the shooter as a "stocky black male and no second shooter." Roberts told the police that there were two shooters, one of whom wore a mask and the other was a stocky black male with long braids. Roberts described the shooting and told the officer that he and the shooter had had an altercation[1] the night before at the nearby Renaissance Grand apartment complex. Faulkner told the police that one of the shooters was a stocky black male with a round face.

---

[1] Det. Schulte was told later that one of the witnesses had said he had had "a physical altercation" with the shooter the night before when people would not move so that the shooter could take his groceries into his residence.

3.  Other detectives went to the Renaissance Grand apartment complex to gather more information about the shooter.  The officers spoke with apartment complex employees.  On the desk of one of the employees was a photo of someone at least one officer recognized as a documented gang member.  One employee referred the police to another employee who might know the shooter; this employee knew the subject in the photo as Antonio.  The officers obtained further information about the subject in the photo from police gang records.  The officers reported to Det. Schulte that this person's name was Antonio Harris.

4.  With the name Antonio Harris and his date of birth, provided by the gang squad detectives, Det. Schulte obtained from the police computer system police photographs of Antonio Harris taken in the St. Louis area. From these photographs of Harris, Det. Schulte selected the most recent one that did not show features which could obscure physical characteristics, such as bandaged wounds and eyeglasses.[2]  Then, with the characteristics of the selected Harris photograph, Det. Schulte tasked the computer system with selecting 75 photographs of individuals with similar characteristics.  From this group of 75 photographs, Det. Schulte personally selected five photographs which he included in a 6-photograph line-up with the photograph of Antonio Harris.[3]  The police computer system randomly selected position #4 for the placement of Harris's photo. At approximately 4:10 p.m. on August 29, 2008, the computer printed copies of this line-up, Government Exhibits A, B, C, and D.  The photo line-up contains no identification information on any of the six photos.

5.  By approximately 4:15 p.m., Det. Schulte returned to the scene of the shooting with the copies of the photo line-up.  The three non-victim witnesses to the shooting were still at the scene.  At that time,

---

[2]Det. Schulte had never met or investigated Antonio Harris before the shooting incident of August 29, 2008.

[3]For these five, Det. Schulte selected photographs in which the subjects were photographed against backgrounds of color similar to the background in Harris's photo, and the selected photographs were of African American males with hair styles and hair lines similar to Harris's.  Each of the photographs selected by the officer also were of subjects of an apparent age similar to Harris's.

the police separated the witnesses. Det. Schulte and Det. Betz first took Jemal Holt alone 50 feet away from the others on the playground. There Det. Schulte told Holt that he had photographs that may or may not contain the shooter and asked him if he recognized anyone. Holt immediately pointed to photo #4 and said, "That's the guy that was shooting." At the officer's request that Holt draw a circle around the person he identified, Holt drew a circle around photo #4 and handwrote his initials ("JH") and the date ("8-29-08"). Gov. Ex. A.

    6.    Next, Det. Schulte, following the same procedure he used in displaying the photo line-up to Holt, displayed another copy of the same line-up, Government Exhibit B, to witness Steven Roberts by himself. Schulte told Roberts that the person responsible for the shooting may or may not be in the line-up. Upon being shown the line-up, Roberts immediately pointed to photo #4 and said, "That's him. That's one of the shooters." The officer then had Roberts circle, initial, and date his selection. Roberts did so, circling photo #4 and handwriting his initials ("S.R.") and the date ("8-29-08"). Gov. Ex. B.

    7.    Next, Det. Schulte showed another copy of the line-up, Government's Exhibit C, to witness Michael Faulkner, following the same procedure he used with witnesses Holt and Roberts. The officers separated Faulkner from the other witnesses and persons at the scene. Again, Det. Schulte told Faulkner that the person responsible for the shooting may or may not be in the line-up and asked him to indicate whether he recognized anyone. Faulkner pointed to photo #4 and said, "Him. That's definitely him." Faulkner circled, initialed ("MF"), and dated ("08/29/08") his selection, photo #4. Gov. Ex. C.

    8.    Approximately an hour after showing the photo line-ups to the other witnesses, Dets. Schulte, Betz, and Sweeney went to the hospital to interview the shooting victim, Anthony Lee, who was 13 years of age. Lee had been shot three times in the incident. Only the three officers and Lee were in the hospital room. Lee described the shooter as an African American male with dredlocks and wearing a mask. Nevertheless, Det. Schulte showed another copy of the photo line-up, Government Exhibit D, to Lee. Lee pointed to photo #4 and identified him as the shooter. Because Lee had said the shooter had worn a mask, Det. Schulte asked Lee

how he could identify #4 as the shooter. Lee responded, "I don't know how I know, but I'm sure that's him."

    9. At no time during the interviews of Holt, Roberts, Faulkner, and Lee did the police indicate which of the persons in the photo line-up was the police suspect.

    10. During the evidentiary hearing held on the motion to suppress the identification testimony, Det. Schulte for the first time looked at Antonio Harris in person in the courtroom and identified Harris as the person depicted in position #4 of the photo line-up.

### **DISCUSSION**

Defendant seeks to have the identification evidence suppressed, arguing that the photo line-up identification procedure was unreliable and suggested to the witnesses whom to identify. Also, defendant argues that the procedure was unreliable because none of the photos depicted a person with a stocky build and because not all of the photo subjects wore long dredlocks.

Under the Due Process Clause, identification evidence must be suppressed, if it results from procedures that are unnecessarily suggestive and that may lead to an irreparably mistaken identification. Stovall v. Denno, 388 U.S. 293, 301-02 (1967). An unconstitutionally suggestive identification, however, may be admissible, if it is nonetheless reliable. Neil v. Biggers, 409 U.S. 188, 198 (1972). Reliability depends upon (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's description of the suspect prior to the identification; (4) the witness's level of certainty at the time of the identification; and (5) the length of time between the crime and the identification. Manson v. Brathwaite, 432 U.S. 98, 114-16 (1977).

In this case, the photo line-up procedure employed by Det. Schulte did not suggest that photo #4 was whom the police suspected of the crime, and the use of the line-up was not of such a character that it may have led to an irreparably suggestive identification.

Nothing in the manner in which the photo line-ups were administered was suggestive. Great care went into the creation of the line-up. Each non-victim witness was shown the line-up shortly after the shooting and at the scene of the shooting. Other than the fact that there was a possibility that the shooter was depicted in the photos, which a reasonable person would have deduced from the fact the police were showing the line-up in the first place, nothing Det. Schulte said to each witness indicated whom the police may be suspecting. And each of the witnesses and the victim were shown the line-up separately from the others, so that they could not pool their recollections to identify someone.

Nothing in the objective appearance of the line-up photos suggested #4 as the person of police interest. All six of the line-up subjects were of African American males, appearing to be of similar ages and sizes. Each photo subject had braided hair, although of differing lengths. Each photo subject had similar facial hair. None wore glasses. To the court's observation, the background of photo #4 is of a slightly bluish or purplish tone, while the backgrounds of the other five photos appears to be of varying greyish hues. However, given the speed and certainty with which the line-up viewers identified #4, the court concludes that this minor difference in the colors of the photos' backgrounds is insufficient to render the photo line-up as a whole violative of due process.

For these reasons, the photo line-up procedure used by Det. Schulte did not violate due process and the resulting identifications should not be suppressed before trial.

Defendant argues that the photos selected by Det. Schulte for the line-up did not include anyone of an apparently stocky build and not all of the photos included persons with long hair braids. Defendant argues that the lack of these characteristics rendered the line-up procedure unreliable. Because the procedures used in preparing and displaying the photo line-up were not unconstitutionally suggestive, however, defendant's arguments are irrelevant to whether the photo line-up identifications should be suppressed. Rather, these factors, and perhaps the testimony that the victim could identify photo #4 even though the

shooter wore a mask, are relevant to whether the identifications should be believed or not by the jury at trial.

> Short of that point [where the identification procedure is not constitutionally unreliable], such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries. . . . Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

Manson, 432 U.S. at 116 (involving suggestive single subject showup); United States v. Tucker, 169 F.3d 1115, 1118 (8th Cir. 1999)(involving array of photographs held to be not suggestive).

For these reasons,

**IT IS HEREBY ORDERED** that the motion of defendant Antonio Harris to sever the counts of the indictment for separate trial (Doc. 37) is sustained.

**IT IS FURTHER ORDERED** that the motion of the United States for a determination by the court of the admissibility or not of any arguably suppressible evidence (Doc. 14 oral) is denied as moot and because withdrawn.

**IT IS HEREBY RECOMMENDED** that the motion of defendant Antonio Harris to suppress identification testimony (Doc. 36) be denied.

**IT IS FURTHER RECOMMENDED** that the pretrial motions of defendant Harris to suppress evidence (Docs. 13 oral, 30, 35) be denied because withdrawn.

The parties have ten days to file documentary objections to this Report and Recommendation. The failure to file timely documentary objections may waive the right to appeal issues of fact.

      /S/   David D. Noce  
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 20, 2009.